In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1926

ANNEX BOOKS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF INDIANAPOLIS, INDIANA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 03-CV-00918 SEB VSS — **Sarah Evans Barker**, *Judge*.

ARGUED SEPTEMBER 8, 2005 — DECIDED SEPTEMBER 3, 2009[*]

Before EASTERBROOK, *Chief Judge*, and FLAUM and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Indianapolis revised its adult-
business ordinances in 2003. These amendments expanded the
definition of "adult entertainment business" to include any re-
tail outlet that devotes 25% of more of its space or inventory to,
or obtains at least 25% of its revenue from, adult books, maga-
zines, films, and devices. (Adult "devices" include vibrators, dil-
dos, and body-piercing implements.) See Indianapolis Rev.
Code §807-103. Until 2003 the trigger had been 50%. Any
"adult entertainment business" needs a license, must be well lit
and sanitary, and may not be open on Sunday or between mid-

---

[*] This opinion is being released in typescript. A printed copy will follow.

night and 10 a.m. on any other day. Indianapolis Rev. Code §§ 807-202(a), -301(f), -302.

Four firms defined as "adult entertainment businesses" under the revised ordinance filed this suit, contending that the law violates the first and fourth amendments, applied to the states by the fourteenth. The district court enjoined one portion of the amended ordinance and held that plaintiffs are entitled to notice of inspections. 333 F. Supp. 2d 773, 787–89 (S.D. Ind. 2004). Indianapolis has not appealed from that portion of the decision. The district court rejected plaintiffs' argument that the procedures for the issuance and judicial review of licenses permit the City to take too long, or afford it too much discretion. *Id*. at 778–83. Plaintiffs contest that portion of the decision, but it is supported by *Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004), and *Thomas v. Chicago Park District*, 534 U.S. 316 (2002). Indianapolis gives businesses provisional licenses while judicial review proceeds, Rev. Code §807-207(c), so its ordinance is easier to defend than the one sustained in *Littleton*. See *Andy's Restaurant & Lounge, Inc. v. Gary*, 466 F.3d 550, 556 (7th Cir. 2006). We have nothing else to add to this portion of the district court's thoughtful opinion.

That leaves plaintiffs' challenge to the definition of "adult entertainment business" and the imposition of any limits on these firms, other than whatever rules apply to bookstores and video-rental outlets in general. Indianapolis justifies its restrictions on the ground that they reduce crime and other secondary effects associated with adult businesses. See *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). Although the restrictions are not as extensive as those at issue in *Alameda Books* and *Playtime Theatres*—the City does not, for example, limit the number of adult establishments by prescribing a 1,000-foot buffer zone around each, or require them to locate in industrial zones far from pedestrian traffic—the City nonetheless concedes that its laws are subject to "intermediate" scrutiny because plaintiffs sell books. This means that, to prevail, the City needs evidence that the restrictions actually have public benefits great enough to justify any curtailment of speech.

The sort of evidence that the Justices deemed sufficient in *Alameda Books* and *Playtime Theatres* showed that crime is higher in city blocks (or census tracts) in which adult establishments are located. That could be because real estate is cheaper in

high-crime areas, and that sleazy establishments tend to congregate in low-rent districts. But the fact that crime rose as adult establishments entered the area (see 535 U.S. at 435 (describing the study)) implied that the causal arrow ran from adult businesses to crime, rather than the other way. That could happen because adult establishments attract a particular kind of clientele that is emboldened by association with like-minded people, so that prostitution and public masturbation (for example) are more acceptable near a congeries of sexually oriented businesses than they would be elsewhere. Justice Kennedy put it this way in *Alameda Books*:

> We may posit that two adult stores next door to each other attract 100 patrons per day. The two businesses split apart might attract 49 patrons each. (Two patrons, perhaps, will be discouraged by the inconvenience of the separation—a relatively small cost to speech.) On the other hand, the reduction in secondary effects might be dramatic, because secondary effects may require a critical mass. Depending on the economics of vice, 100 potential customers/victims might attract a coterie of thieves, prostitutes, and other ne'er-do-wells; yet 49 might attract none at all. If so, a dispersal ordinance would cause a great reduction in secondary effects at very small cost to speech. Indeed, the very absence of secondary effects might increase the audience for the speech; perhaps for every two people who are discouraged by the inconvenience of two-stop shopping, another two are encouraged by hospitable surroundings. In that case, secondary effects might be eliminated at no cost to speech whatsoever, and both the city and the speaker will have their interests well served.

535 U.S. at 452–53 (Kennedy, J., concurring in the judgment).

Indianapolis relies on this line of argument, as well as on a study it conducted in 1984, before adopting the original version of the challenged ordinance. This study found higher crime rates near businesses that were defined as "adult". But here the City encounters problems, for the studies on which it relies—like Justice Kennedy's hypothetical—deal with ordinances dispersing adult businesses. The 2003 revision does not require dispersal. Instead it closes all businesses after midnight and on Sundays, and requires bright interior lights when the businesses are open. None of the studies on which the City relied before enacting the law, and none introduced in this record, concerns that kind of ordinance. Nor do the studies show that an increase in adult businesses' operating hours is associated with more crime; the studies are simple cross-sectional analyses that leave causation up in the air. (In other words, they may show no

more than that adult businesses prefer high-crime districts where rents are lower.)

More importantly, the studies to which the City points concern adult businesses that offer live sex shows, private viewing booths, or both. This circuit's decisions likewise concern live entertainment. See, e.g., *R.V.S., L.L.C. v. Rockford*, 361 F.3d 402 (7th Cir. 2004) (exotic-dancing nightclubs); *G.M. Enterprises, Inc. v. St. Joseph*, 350 F.3d 631 (7th Cir. 2003) (nude dancing in bars). Three of the four plaintiffs in this suit, however, do not offer live entertainment or private viewing. They are simple book or video outlets, brought under the regulatory umbrella only because 25% or more of their sales come from sex-related materials. Until the 2003 amendments, these stores were treated the same as Barnes & Noble or Blockbuster Video. If they were associated with significant crime or disorderly conduct, it should be easy for Indianapolis to show it. But the City has not offered an iota of evidence to that effect.

The City's only evidence about the four plaintiffs is that during 2002 the police made 41 arrests for public masturbation at Annex Books, the only plaintiff that offers private booths. (The masturbation was "public" in the sense that officers could see what customers were doing inside the booths.) The district court thought this datum enough, by itself, to support the 2003 amendments. Yet it is hard to grasp how misdemeanors committed in single-person booths justify the regulation of book and video retailers that lack such booths.

Indeed, we do not know when the arrests occurred. Unless most of them were after midnight, or on Sunday, they don't justify the ordinance even with respect to establishments that supply entertainment on the premises. Nor can we tell whether 41 arrests at one business over the course of 365 days is a large or a small number. How does it compare with arrests for drunkenness or public urination in or near taverns, which in Indianapolis can be open on Sunday and well after midnight? If there is more misconduct at a bar than at an adult emporium, how would that justify greater legal restrictions on the bookstore—much of whose stock in trade is constitutionally protected in a way that beer and liquor are not.

Indianapolis has approached this case by assuming that any empirical study of morals offenses near any kind of adult establishment in any city justifies every possible kind of legal restric-

tion in every city. That might be so if the rational-relation test governed, for then all a court need do is ask whether a sound justification of a law may be imagined. See, e.g., *Vance v. Bradley*, 440 U.S. 93 (1979); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976). But because books (even of the "adult" variety) have a constitutional status different from granola and wine, and laws requiring the closure of bookstores at night and on Sunday are likely to curtail sales, the public benefits of the restrictions must be established by evidence, and not just asserted. The evidence need not be local; Indianapolis is entitled to rely on findings from Milwaukee or Memphis (provided that a suitable effort is made to control for other variables). See *Andy's Restaurant*, 466 F.3d at 554–55. But there must be *evidence*; lawyers' talk is insufficient.

*Alameda Books* establishes that much. Four Justices would have ruled for the plaintiff, without need for a trial, even though the empirical support for the Los Angeles ordinance was materially stronger than the data that Indianapolis proffers. 535 U.S. at 453–66 (Souter, J., joined by Stevens, Ginsburg & Breyer, JJ.). (The Los Angeles study was stronger because it implied causation and not just correlation.) The other five Justices concluded that a hearing was necessary to determine whether the evidence that Los Angeles offered was strong enough. *None* of the Justices thought that summary judgment could be granted in the municipality's favor when the strength of, and appropriate inferences from, the studies were contested. (Well, "none" is an overstatement. Justice Scalia concluded that pandering may be prohibited without any need for evidence. 535 U.S. at 443–44 (concurring opinion). But Indianapolis does not defend its ordinance on that basis.) Justice O'Connor's plurality opinion (joined by Chief Justice Rehnquist and Justices Scalia and Thomas) was explicit (535 U.S. at 438–39):

> [A] municipality [cannot] get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in [*Playtime Theatres*]. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

Instead of adducing data to support the regulation of bookstores that do not furnish on-site viewing, Indianapolis is content to belittle plaintiffs' evidence. Plaintiffs offered a study by Daniel Linz, a professor at the University of California, Santa Barbara. Linz first examined the relation between crime and adult establishments in Indianapolis, using smaller units than the City had done. (Linz used census tracts, while the City used whole city blocks or larger districts.) He found little relation—and he added a time series, while the City relied on a cross section. In other words, Linz conducted the same kind of analysis as the Los Angeles study in *Alameda Books*, asking whether crime went up in a given census tract when new adult establishments opened, or down when they closed. Linz concluded that these openings and closings did not materially affect crime. Linz also critiqued the methodology of studies conducted by Indianapolis and other cities.

One may doubt that Linz's work is the last word; a multivariate regression would provide a better foundation than either a time series or a geographic cross-section. See Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, Reference Manual on Scientific Evidence (2d ed.) (Federal Judicial Center 2000). Linz also disregards some sex-linked crimes, such as exposure and prostitution. That's like studying the effects of taverns while ignoring arrests for drunk driving. (Linz does consider arrests for rape and child molestation, however.) But the City, which offered only the simple cross-section, is in no position to complain. Instead the City observed that Linz compared differences between 2001 and 2003, ignoring 2002, which (apparently) was a peak year for arrests in Annex Books. Yet the City did not apply Linz's methods to the time series 2001, 2002, 2003 to see whether the omission mattered; instead it just asserted that the choice of years automatically invalidated the study, which is not a sound conclusion.

Instead of adducing a serious critique of Linz's work, or tackling the subject directly (Linz's data and methods were disclosed in his study), the City asserts that the federal judiciary has already decided that all of Linz's work must be ignored. It contends that, in *G.M. Enterprise*, 350 F.3d at 640, we called Linz's methods "completely unfounded." Not at all. What we called "completely unfounded" was counsel's assertion that a city's justifications have to satisfy the *Daubert* standard for expert testimony. (See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579 (1993).) Linz had observed that some studies offered in that case were not "reliable," as Fed. R. Evid. 702 uses that word. We thought that *Alameda Books* allows municipalities to take all kinds of evidence into account; this differs from saying that nothing Linz writes may be credited.

Counsel for Indianapolis conceded at oral argument that none of the studies that the City has offered in defense of its ordinance deals with the secondary effects of stores that lack private booths. Nor do the studies assess the effects of stores that sell as little as 25% adult products. These shortcomings, plus Linz's work, call the City's justifications into question and require an evidentiary hearing at which the City must support its ordinance under the intermediate standard of *Alameda Books*. See also *Abilene Retail #30, Inc. v. Dickinson County*, 492 F.3d 1164 (10th Cir. 2007) (reaching the same conclusion on a similar record). The Supreme Court decided *Playtime Theatres* more than 30 years ago, and since then adult-entertainment ordinances have become common. There must be some pertinent data to be gathered, if not in Indianapolis then elsewhere. (Some can be found in a bibliography at http://www.secondaryeffectsresearch.com.) But if, as is possible, there is simply no sound basis for a conclusion that book or video stores (without live entertainment or private booths) open after midnight, or on Sunday, cause adverse secondary effects, then Indianapolis must revert to its pre-2003 system of regulation.

We are conscious that "hold an evidentiary hearing and apply intermediate scrutiny" is not very helpful to the district judge, or for that matter the lawyers. It is possible to be a little more concrete, however, thanks to Justice Kennedy's opinion in *Alameda Books*. Because the other Justices divided 4 to 4, and Justice Kennedy was in the middle, his views establish the holding. See *Marks v. United States*, 430 U.S. 188 (1977). He concluded that a regulation of adult bookstores "can be consistent with the First Amendment if it is likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech." 535 U.S. at 445 (concurring opinion). "[A] city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact. ... A city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. Justice

Kennedy insisted that the benefits (less crime) be compared with the detriments (less speech) and added that a given regulatory system is easier to justify if it works in the same way as the regulation of other, similar, businesses, for then it is harder to conclude that the government has set out to curtail speech because of its subject matter. *Id*. at 447–49.

These thoughts should give some structure to the hearing on remand—though we recognize that, because crime and speech cannot be reduced to a common metric, a direct comparison (how much speech should be sacrificed to achieve how much reduction in crime?) is difficult if not impossible. Here it matters that both Justice O'Connor's opinion for the plurality, and Justice Kennedy's concurrence, conclude that municipalities should get the benefit of the doubt. Principles of federalism support experimentation, and one aspect of freedom is the power to be different. The standards of Manhattan, New York, need not be followed in Manhattan, Kansas. See 535 U.S. at 439 (plurality opinion), 451 (Kennedy, J., concurring). See also *Illinois One News, Inc. v. Marshall*, 477 F.3d 461 (7th Cir. 2007) (ability of a small town's residents to obtain adult materials outside its borders may show that no material curtailment of expression has occurred). Cf. *National Rifle Association of America, Inc. v. Chicago*, 567 F.3d 856, 860 (7th Cir. 2009).

The parties have pressed on us dozens of precedents, from this circuit and elsewhere, that do more to show the problems of interpretation and application created by the fractured decision in *Alameda Books* than to establish any concrete legal rule. Few of these decisions offer much guidance, either to us or to the district court on remand, because few deal with hours-of-operation rules applicable to businesses that do not offer on-site viewing. It is accordingly unnecessary for us to canvass the dozens of appellate decisions that have struggled to understand and apply *Alameda Books*. For example, *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153 (9th Cir. 2003), and *Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512 (6th Cir. 2009), both sustained regulations applicable to book and video stores, but only after concluding that the plaintiffs had not undermined

the justifications for the laws.† We refrain from a survey, which would lengthen this opinion without edifying the reader.

But one of these decisions, in addition to *Abilene Retail* (cited above), offers a little assistance. San Antonio adopted a dispersal rule (1,000 feet between adult businesses) that applied to a set of outlets defined to include stores that did nothing but sell books, tapes, and DVDs, which customers could not watch on premises. The fifth circuit held in *Encore Videos, Inc. v. San Antonio*, 330 F.3d 288 (5th Cir. 2003), that this ordinance violated the first amendment, because San Antonio had not offered any evidence that adult video stores lacking facilities for on-premises viewing create the same secondary effects as other establishments. If Indianapolis cannot produce such evidence, satisfying Justice Kennedy's cost-benefit standard, its ordinance must meet the same fate as San Antonio's.

The judgment is affirmed to the extent that it sustained the licensing procedures but is reversed to the extent it concerns the coverage and substantive requirements, and the case is remanded for an evidentiary hearing consistent with this opinion.

---

† *Richland Bookmart* and *H&A Land Corp. v. Kennedale*, 480 F.3d 336, 339 (5th Cir. 2007), treated the study that Indianapolis conducted in 1984 as supporting a conclusion that stores selling adult books and videos create adverse secondary effects. Yet Indianapolis does not deem its own study to support that conclusion, and our review of the 1984 study confirms the City's understanding. The 1984 study does not differentiate by type of adult business. The City did poll brokers to learn whether they thought that "adult bookstores" would depress real estate prices (most answered yes), but the study did not *define* "adult bookstore." Who knows whether brokers envisaged on-premises entertainment, or whether they thought that 25% of sales makes an establishment "adult"? An opinion poll differs from a concrete result. (The 1984 study did not limit the survey to brokers who had experience buying or selling adult establishments, or in places near those establishments.) The authors inquired whether real estate prices are lower near adult businesses, but that part of the study lumps all adult establishments together; it does not distinguish between bookstores and topless bars or peepshows. This part of the study does contain a perfunctory time series analysis, however, in an attempt to inquire whether adult businesses seek out, rather than cause, low prices. It concludes that prices appreciate less in parts of the city where adult businesses congregate. See *Adult Entertainment Businesses in Indianapolis: An Analysis* 30–31 (1984).