In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1642

FOXXXY LADYZ ADULT WORLD, INC.,
and DIRT CHEAP, INC.,

*Plaintiffs-Appellants*,

*v.*

VILLAGE OF DIX, ILLINOIS,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:13-cv-00482 — **Michael J. Reagan**, *Chief Judge*.

ARGUED DECEMBER 11, 2014 — DECIDED MARCH 10, 2015

Before WOOD, *Chief Judge*, and FLAUM and MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs, owners of an adult entertainment establishment that features nude dancing and permits customers to bring their own alcoholic beverages onto the premises, challenge the enactment of three local ordinances that ban public nudity, open containers of alcohol in public, and the possession of liquor in public accommoda-

tions. Plaintiffs argue that the public nudity ban violates the free speech protections of the First Amendment, and further allege that the Village of Dix lacks statutory authority to pass the challenged alcohol restrictions. Dix filed a motion to dismiss the complaint for failure to state a claim, which the district court granted as to both issues. Because we conclude that, at this early stage of the litigation, Dix has not established the necessary evidentiary basis for its assertion that nude dancing causes adverse secondary effects to the health, welfare, and safety of its citizens, we reverse the district court's judgment with respect to the public nudity ordinance. However, we affirm the district court's dismissal of plaintiffs' challenge to Dix's alcohol regulations, the enactment of which falls within the parameters of Illinois law and is supported by a rational basis.

## I. Background

The Village of Dix is a "dry" municipality of approximately 500 residents, located in Jefferson County, Illinois. In October 2010, Dirt Cheap, Inc. purchased commercial real estate in Dix and opened a nightclub offering erotic entertainment. Two years later, Foxxxy Ladyz Adult World, Inc. began to rent the property from Dirt Cheap. Now operated by Foxxxy Ladyz, the nightclub features nude dancing and is open to all members of the public age twenty-one and over. Although Foxxxy Ladyz does not sell alcohol, it allows its customers to bring their own alcoholic beverages ("BYOB") onto the premises. Foxxxy Ladyz is one of the few commercial establishments in Dix, and is located across the interstate highway from the Village's other businesses, residences, and grade school.

In December 2010, shortly after Dirt Cheap opened Foxxxy Ladyz's predecessor, Dix passed three ordinances, each of which banned certain behavior throughout the Village. First, Ordinance No. 2010-04 instituted a prohibition on open containers of alcohol in public. The preamble to the ordinance explains that "the sale at retail of alcoholic liquor is [already] prohibited by law" in Dix, and expresses a desire to "preserve the 'dry' status of the Village of Dix to the fullest extent permitted by law." The preamble further asserts that "the prohibition on the retail sale and public consumption of alcoholic liquor within [Dix] is in the public interest to maintain social order, health, welfare, and safety of citizens." The ordinance prohibits the possession of "any open container of alcoholic liquor" in any "public place" within the Village. The ordinance specifies that "public place" includes any "privately owned [property], which is open to or held out for use by the public or is otherwise available to the public."

Dix next enacted Ordinance No. 2010-05, a public nudity ban also aimed at preserving "social order, health, welfare, and safety of citizens." This ordinance replaced Ordinance No. 9, Section 7, which had been in effect in Dix since 1930 and which provided, "No person shall appear in any public place in a state of nudity, nor in a dress not belonging to his or her sex, or any indecent or lewd dress, or make any indecent exposure of his or her person, … nor shall commit any indecent or lewd act."[1] Expressing a "desire[] to continue the prohibition on public nudity within the Village of Dix" and

---

[1] Plaintiffs allege that Dix's prohibition on "indecent or lewd dress" is unconstitutionally vague. The challenged language, however, has been omitted from Dix's revised public nudity ordinance. We therefore need not address this argument.

to "update the [1930 ordinance] to use language which has been approved by the Courts as consistent with the Illinois and United States Constitution," Ordinance No. 2010-05 reads:

> No person shall knowingly or intentionally appear nude or in a state of nudity in a public place.
>
> "Public place" means any location frequented by the public or where the public is present or likely to be present or any location where a person may reasonably be expected to be observed by members of the public or any place to which the public has a right to go or is invited.
>
> "Nude" or "State of Nudity" means the showing of the human male or female genitals, pubic area, vulva, anus, or anal cleft or cleavage with less [than] a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola, or the showing of the covered male genitals in a discernibly turgid state.

An individual can comport with Ordinance No. 2010-05 by wearing pasties and a G-string.

The third ordinance, No. 2010-06, prohibits the possession of liquor in public accommodations. The ordinance—whose preamble largely restates the preamble to Ordinance No. 2010-04—defines "public accommodation" as "a refreshment, entertainment or recreation facility of any kind whose goods, services, facilities, privileges or advantages are extended, offered, sold or otherwise made available to the

public." In enacting these ordinances, Dix conducted no studies, nor did it expressly cite other evidence suggesting that the operation of Foxxxy Ladyz would lead to increased crime or other undesirable "secondary effects" associated with sexually oriented businesses.

An individual who violates any of these ordinances is subject to a fine between $100.00 and $750.00 per violation, and may also be enjoined from committing further offenses. Given that Foxxxy Ladyz is a BYOB establishment that offers fully nude dancing, it concededly operates in violation of all three ordinances. In March 2013, the Dix Village Board sent Foxxxy Ladyz a notice explaining that its actions constitute a nuisance, and ordering Foxxxy Ladyz to immediately comply with the applicable ordinances.

Shortly thereafter, plaintiffs filed suit in the United States District Court for the Southern District of Illinois. They argue that Dix's public nudity ban violates the free speech protections of the First Amendment (incorporated against the states by the Fourteenth Amendment) and the Illinois Constitution.[2] Plaintiffs also allege that Dix lacks authority to pass the alcohol restrictions embodied in Ordinance Nos. 2010-04 and 2010-06 as a result of the limitations imposed upon municipal regulation of alcohol by the Illinois Liquor

---

[2] Although plaintiffs contend that the Illinois Constitution's protection of speech is broader than that found in the First Amendment of the United States Constitution, this court has determined that "the Constitution of the State of Illinois protects an individual's right to free speech *only to the same extent* that such speech is protected by the Constitution of the United States." *Trejo v. Shoben*, 319 F.3d 878, 884 n.2 (7th Cir. 2003) (emphasis added). Therefore, we need not independently address plaintiffs' state law claims.

Control Act, 235 Ill. Comp. Stat. 5. Dix moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted Dix's motion as to both claims. With respect to plaintiffs' challenge to the public nudity ban, the district court concluded first that Ordinance No. 2010-05 is content neutral because it is targeted not at the suppression of free expression but instead at reducing the harmful secondary effects associated with nude dancing; and second, that the ordinance survives the four-prong test for content-neutral symbolic speech established by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968). The district court next concluded that Dix acted within the parameters of Illinois law in enacting both of the challenged alcohol restrictions. Determining that the open container and BYOB regulations abridged no fundamental right, the court applied a rational basis test and concluded that both prohibitions withstand this deferential standard of review. Plaintiffs appeal the district court's ruling as to both issues.

## II. Discussion

We review de novo a district court's grant of a motion to dismiss for failure to state a claim, *Alexander v. McKinney*, 692 F.3d 553, 555 (7th Cir. 2012), "constru[ing] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [plaintiff's] favor." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).

### A. Public Nudity Ban

Although "[b]eing 'in a state of nudity' is not an inherently expressive condition," *City of Erie v. Pap's A.M.*, 529

U.S. 277, 289 (2000) (plurality opinion), "nude dancing … is expressive conduct within the outer perimeters of the First Amendment." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (plurality opinion). Dix contends that Ordinance No. 2010-05 is targeted not at nude dancing itself, but rather at minimizing the deleterious "secondary effects"—such as "the impacts on public health, safety, and welfare," *Pap's A.M.*, 529 U.S. at 291—caused by the presence of adult entertainment establishments. When faced with such a legislative justification, this court has "presume[d] that the government did not intend to censor speech, even if the regulation incidentally burdens particular instances of expressive conduct." *Schultz v. City of Cumberland*, 228 F.3d 831, 841 (7th Cir. 2000) (citing *Pap's A.M.*, 529 U.S. at 291). Nevertheless, because Dix's public nudity ban does entail an incidental limitation on expressive activity, it must satisfy certain constitutional standards. *G.M. Enters., Inc. v. Town of St. Joseph, Wis.*, 350 F.3d 631, 636 (7th Cir. 2003).

The U.S. Supreme Court has held that municipality-wide regulations of public nudity, such as the ordinance at issue here, are properly evaluated under the framework set forth in *United States v. O'Brien*, 391 U.S. 367, for content-neutral restrictions on symbolic speech. *Pap's A.M.*, 529 U.S. at 289; *see also G.M. Enters.*, 350 F.3d at 638 ("Regulations of public nudity … are analyzed under the intermediate scrutiny test of *United States v. O'Brien*."). The Supreme Court first applied the *O'Brien* standard to a public nudity ordinance in its fractured 1991 decision, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560. *Barnes* addressed the constitutionality of an Indiana public indecency statute nearly identical to Dix's regulation, which banned "nudity" in a "public place," effectively requiring exotic dancers to wear pasties and G-strings. *Id.* at

563, 569 n.2. The Court noted that Indiana, like Dix here, "ha[d] not banned nude dancing as such, but ha[d] proscribed public nudity across the board" in all public accommodations. *Id.* at 566. The Court[3] determined that the statute was unrelated to the suppression of free expression—and was therefore content neutral—concluding that "while the dancing to which [the statute applies] ha[s] a communicative element, it [i]s not the dancing that [i]s prohibited, but simply its being done in the nude." *Id.* at 570–71. Because Ordinance No. 2010-05 applies to all "public places" within Dix and permits erotic dancing so long as pasties and G-strings are worn, it merits the same constitutional analysis.

Under the *O'Brien* test, a regulation of public nudity will be upheld if (1) the regulation is within the constitutional power of the government; (2) the regulation furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the restriction on alleged First Amendment freedoms is no greater than essential to further the government's interest. *O'Brien*, 391 U.S. at 377. Ordinance No. 2010-05 easily satisfies three of these four prongs. With respect to the first prong of the analysis, the Supreme Court established in *City of Erie v. Pap's A.M.* that the passage of a substantially similar public nudity ordinance to "protect public health and safety [was] clearly within [a] city's [constitutional] police powers." 529 U.S. at 296. Dix's proffered rationale

---

[3] Justice Souter provided the necessary fifth vote in *Barnes*, and, as the narrowest opinion in support of the judgment of the Court, under *Marks v. United States*, 430 U.S. 188, 193 (1977), his concurrence is controlling. He agreed with the plurality as to the question of content neutrality. *See Barnes*, 501 U.S. at 586 (Souter, J., concurring in the judgment).

for Ordinance No. 2010-05—the maintenance of "social or-der, health, welfare, and safety of citizens"—is essentially the same as that advanced by the city of Erie. *O'Brien*'s third prong, which inquires whether the governmental interest is unrelated to the suppression of free expression, is identical to the antecedent content neutrality inquiry, addressed above. Finally, with regard to the fourth prong, which ex-plores whether a challenged restraint on symbolic speech is any more restrictive than necessary to further the govern-ment's interests, the Supreme Court has concluded that a pasties and G-string requirement imposes only a de minimis restriction on freedom of expression, and one that is "minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." *Barnes*, 501 U.S. at 587 (Souter, J., concurring in the judgment); *see also G.M. Enters.*, 350 F.3d at 636 ("The requirement that dancers wear pasties and G-strings has only a '*de minimis*' effect on the ex-pression conveyed by nude dancing.").

Dix's public nudity ban fares less well, however, with re-spect to the second prong of *O'Brien*, which demands that Ordinance No. 2010-05 "further[] an important or substantial governmental interest." 391 U.S. at 377. As we have ex-plained, Dix's asserted justification for the ordinance's en-actment is the reduction of adverse secondary effects associ-ated with establishments that offer erotic entertainment—an interest whose validity the *Barnes* Court acknowledged. *See* 501 U.S. at 582 (crediting Indiana's "substantial interest in combating the secondary effects of adult entertainment es-tablishments"). However, while the minimization of second-ary effects may, in the abstract, satisfy *O'Brien*'s "substantial governmental interest" requirement, Dix must nevertheless offer some evidence that nude dancing in fact generates such

deleterious effects. *See G.M. Enters.*, 350 F.3d at 638–39 (assessing "what quality and quantum of evidence a regulating body must consider in order to demonstrate that it has a reasonable basis for believing that the regulated activity generates adverse secondary effects, the reduction of which is a 'substantial government interest' under the … *O'Brien* test[]"). The outcome of this appeal ultimately turns on whether, in enacting the challenged ordinance, Dix relied on evidence sufficient to suggest that public nudity would give rise to adverse secondary effects in the Village.

The parties dispute the evidentiary foundation that a municipality must establish in order to invoke secondary effects as the justification for an ordinance burdening freedom of expression. Plaintiffs contend that Dix must point to actual data—be it from Dix itself or from a comparable municipality—indicating a real harm that the Village's public nudity ban would serve to mitigate. Dix counters that because the language of Ordinance 2010-05 was intentionally modeled after that of public nudity bans that have "been approved by the Courts as consistent with the Illinois and United States Constitution," prior judicial opinions addressing those bans provide all findings necessary to support Ordinance No. 2010-05's enactment.

The district court shared Dix's view. The court rejected plaintiffs' argument that Dix "needed a 'predicate'—some study, factual finding, or other evidence—in order to justify that its nudity ban would combat the secondary effects of nude dancing." *Foxxxy Ladyz Adult World, Inc. v. Vill. of Dix, Ill.*, No. 13-482, slip op. at 10 n.5 (S.D. Ill. Mar. 12, 2014). According to the court, "The *Pap's A.M.* plurality made clear that relying on the evidentiary foundation of harmful sec-

ondary effects set forth in previous caselaw provides an adequate rationale for passing a nudity ban." *Id.* (citing *Pap's A.M.*, 529 U.S. at 296–97). This conclusion was in error. While *Pap's A.M.* may have suggested that reliance on prior case law was sufficient to justify the imposition of a ban on public nudity,[4] the Supreme Court, in its subsequent decision, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (plurality opinion), clarified that the evidentiary standard a municipality must satisfy in order to constitutionally impose a restriction on adult entertainment venues is not so lenient.

The Court first addressed this standard in its 1986 opinion, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41. There, the city of Renton, Washington (population 32,000) enacted a zoning ordinance prohibiting the operation of any "adult motion picture theater" within 1,000 feet of any residential zone, church, park, or school. *Id.* at 44. Prior to enacting the ordinance, which "was aimed at preventing the secondary effects caused by the presence of even one such theater in a given neighborhood," the city held public hearings,

---

[4] To be sure, the district court's conclusion is not without support from the plurality opinion in *Pap's A.M.* Evaluating a public nudity ban akin to that at issue in *Barnes* and in the instant case, the plurality concluded, "Because the nude dancing at [plaintiff's establishment] is of the same character as the adult entertainment at issue in [prior Supreme Court cases], it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects." 529 U.S. at 296–97 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976) (plurality opinion); and *California v. LaRue*, 409 U.S. 109 (1972)). However, as we discuss in greater detail below, subsequent case law from the Supreme Court and from our own circuit establishes more stringent evidentiary requirements.

considered studies produced by nearby Seattle, and reviewed a report from the City Attorney's Office detailing similar developments in other cities. *Id.* at 44, 50. In evaluating whether Renton had sufficiently demonstrated the existence of adverse secondary effects when it relied heavily on data from other cities rather than on legislative findings specific to Renton, the Court endorsed Renton's reliance on "the experiences of Seattle and other cities, and in particular on the 'detailed findings' summarized in the Washington Supreme Court's *Northend Cinema* opinion." *Id.* at 51 (citing *Northend Cinema, Inc. v. City of Seattle*, 585 P.2d 1153 (Wash. 1978)). "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses*." Id.* at 51–52. This language, which led the Court to uphold Renton's ordinance as a valid governmental response to the "admittedly serious problems" created by adult theatres, *id.* at 54, has provided the baseline for all subsequent Supreme Court decisions addressing a municipality's evidentiary burden in imposing restrictions on adult entertainment establishments.

*Renton* was followed by *Barnes* and *Pap's A.M.*—both plurality opinions in which the Court upheld public nudity bans over First Amendment challenge, invoking *Renton*'s evidentiary standard and endorsing reliance on prior case law to meet that standard. *See Barnes*, 501 U.S. at 584 (noting that because the type of entertainment the government sought to regulate was "plainly of the same character as that at issue in *Renton*, …. [i]t is therefore no leap to say that live nude dancing of the sort at issue here is likely to produce the same

pernicious secondary effects"); *see also Pap's A.M.*, 529 U.S. at 296–97. Recognizing that the divided opinions in *Pap's A.M.* and *Barnes* may have muddied the waters regarding the nature and extent of the evidence a governmental body must evaluate in order to conclude that a regulated activity produces adverse secondary effects, the Court granted certiorari in *City of Los Angeles v. Alameda Books, Inc.*, "to clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*." 535 U.S. at 433.

In *Alameda Books*, plaintiff operators of an adult bookstore and adult video arcade challenged a 1983 Los Angeles ordinance prohibiting the operation of multiple adult businesses in the same building. *Id.* at 431–32. In enacting the ordinance, Los Angeles looked to a 1977 study it had conducted, which focused not on the effects of multiple adult entertainment businesses within a single complex, but rather on the effects of a concentration of separate adult establishments within close geographic proximity. *Id.* at 430. Although Los Angeles did not consider evidence bearing directly on the alleged link between multiple-use adult establishments and negative secondary effects, the Supreme Court determined that Los Angeles permissibly relied on the 1977 study. *See id.* at 436 ("[I]t is rational for the city to infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates.").

In an attempt to crystalize the evidentiary standard set forth in *Renton*, the *Alameda Books* plurality explained,

> In *Renton,* we .… held that a municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a con-

> nection between speech and a substantial, in-
> dependent government interest. This is *not to
> say that a municipality can get away with shoddy
> data or reasoning. The municipality's evidence
> must fairly support the municipality's rationale for
> its ordinance*.[5]

*Id.* at 438 (emphasis added) (citations omitted) (quoting *Renton*, 475 U.S. at 51). Concluding that Los Angeles, "at th[at] stage of the litigation, ha[d] complied with the evidentiary requirement in *Renton*," *id.* at 439, the Court reversed the Ninth Circuit's grant of summary judgment in plaintiffs' favor, and remanded the case for an evidentiary hearing to determine whether Los Angeles's secondary effects evidence was strong enough to justify the challenged ordinance. The Court declined, however, to conclusively hold that the ordinance complied with the dictates of the First Amendment. *See id.* at 453 (Kennedy, J., concurring in the judgment) ("If [Los Angeles's evidentiary basis] can be proved unsound at trial, then the ordinance might not withstand intermediate scrutiny.").

In the wake of *Alameda Books*, our court has been consistent in requiring that a regulating body produce some specific, tangible evidence establishing a link between the regulated activity and harmful secondary effects. Our decision in *Annex Books, Inc. v. City of Indianapolis, Ind.*, 581 F.3d

---

[5] Justice Kennedy, who provided the necessary fifth vote in *Alameda Books*, agreed with the evidentiary standard set forth by the plurality. In analyzing "how much evidence is required to support the proposition" that a particular establishment may create negative secondary effects, he concluded that "[t]he plurality … gives the correct answer." 535 U.S. at 449 (Kennedy, J., concurring in the judgment).

460 (7th Cir. 2009), is particularly instructive. In *Annex Books*, Indianapolis revised its ordinances relating to adult businesses, expanding the definition of "adult entertainment business" and prohibiting the operation of such businesses after midnight or on Sundays. *Id.* at 461.[6] The city attempted to justify the restrictions on the ground that they would "reduce crime and other secondary effects associated with adult businesses." *Id.* at 462. In setting forth the applicable evidentiary standard, we interpreted *Alameda Books* to require a demonstration that a regulation is "'likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech.' '[In other words, a] city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects … .'" *Id.* at 465 (quoting *Alameda Books*, 535 U.S. at 445, 449).

In revising the challenged ordinances, Indianapolis relied on a 1984 study that found higher crime rates near adult businesses. However, we rejected the study's probative value, concluding that it was relevant only to a restriction on the high concentration of adult businesses in a particular geographic area, which Indianapolis's ordinances did not seek

---

[6] Although the regulations at issue in *Annex Books* were more extensive than those at issue in the instant case, it is clear that intermediate scrutiny applies to both sets of regulations. *See Annex Books*, 581 F.3d at 462 ("[Indianapolis] concedes that its laws are subject to 'intermediate' scrutiny … ."); *Schultz*, 228 F.3d at 841 ("[A] general prohibition on all public nudity receives intermediate scrutiny … when the government offers as its legislative justification the suppression of public nudity's negative secondary effects."). Therefore, the district court was incorrect to conclude that *Annex Books* is not relevant because it involved ordinances specifically targeted at adult businesses while Dix's ordinance is a general village-wide ban on nudity.

to regulate. *Id.* at 462. We also objected to the fact that most of the plaintiffs were book and video outlets, which did not offer live entertainment, but that the studies that Indianapolis cited dealt exclusively with live entertainment venues. *Id* at 463. In summarizing the flaws in Indianapolis's research, we explained,

> Indianapolis has approached this case by as-suming that any empirical study of morals of-fenses near any kind of adult establishment in any city justifies every possible kind of legal restriction in every city. … But because books (even of the "adult" variety) have a constitu-tional status different from granola and wine, … the public benefits of the restrictions must be established by evidence, and not just asserted. The evidence need not be local; Indianapolis is entitled to rely on findings from Milwaukee or Memphis (provided that a suitable effort is made to control for other variables). But there must be *evidence*; lawyers' talk is insufficient.

*Id.* (citations omitted). We ultimately held that the "short-comings" of the secondary effects evidence cited by Indian-apolis "call[ed] the City's justifications into question and re-quire[d] an evidentiary hearing at which the City must sup-port its ordinance under the intermediate standard of *Alame-da Books*." *Id.* at 465.

We reaffirmed this evidentiary standard in *New Albany DVD, LLC v. City of New Albany, Ind.*, 581 F.3d 556 (7th Cir. 2009). There, the city of New Albany enacted a prohibition on the operation of any sexually oriented business within 1,000 feet of any church, which prevented plaintiff adult

book and video outlet from operating in its current location. *Id.* at 558. The district court granted plaintiff's motion for a preliminary injunction, which the city appealed. Although we found fault with the district court's conclusion that New Albany's ordinance was not narrowly tailored, *id.* at 558–59, we nonetheless agreed that the city—at least at that point in the litigation—had not demonstrated that the plaintiff's establishment, or other comparable businesses, generated any adverse secondary effects. *Id.* at 559. With respect to New Albany's first proffered injurious secondary effect—increased theft—we concluded that the city had not offered evidence that "fairly support[ed]" the contention that adult bookstores located near churches attracted thieves. *Id.* at 560.

We also found that the city had produced insufficient evidentiary support for the ordinance's alternative justification—an increase in pornographic litter. We determined that, in order to salvage the anti-litter rationale on remand, New Albany would be required to present evidence establishing "(a) how much sex-oriented litter an adult bookstore generates; (b) who is likely to see that litter in the parts of New Albany where adult bookstores are allowed to operate; and (c) how much adult litter will remain in New Albany's central business area … if plaintiff is exiled." *Id.* at 561. In sum, both *Annex Books* and *New Albany* require that a municipality enacting an ordinance that burdens freedom of expression demonstrate a reasonable connection between the cited evidentiary basis for its regulation and the specific facts and circumstances on the ground.

Applying this precedent to Ordinance No. 2010-05, we reverse the district court's grant of Dix's motion to dismiss. To pass constitutional muster, Dix must provide some con-

crete evidence indicating that public nudity generates adverse secondary effects. Dix has produced no such evidence—either within the Village itself or in an analogous municipality. All Dix has offered is the generic maxim that it "is in the public interest to maintain social order, health, welfare, and safety of citizens." As we observed in *Annex Books*, if public nudity is "associated with significant crime or disorderly conduct, it should be easy for [the municipality] to show it." 581 F.3d at 463. But, like Indianapolis there, Dix here "has not offered an iota of evidence to that effect." *Id.*

As for the "quality and quantum of evidence" Dix must produce, *G.M. Enters.*, 350 F.3d at 638, the Village retains considerable flexibility in identifying evidentiary support. As we explained in *Annex Books*, Dix is not required to conduct independent studies regarding undesirable secondary effects, but rather may rely on evidence from other municipalities—"provided that a suitable effort is made to control for other variables." 581 F.3d at 463. There is also no need for the relied-upon evidence to meet the demanding requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the governing standard for the admissibility of expert testimony at trial. *See G.M. Enters.*, 350 F.3d at 640 (rejecting as "completely unfounded" the contention that a municipality cannot establish a reasonable basis for believing its regulations will reduce adverse secondary effects "unless the studies it relied upon are of sufficient methodological rigor to be admissible under *Daubert*"). We recognize that Dix is entitled to a "reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." *Alameda Books*, 535 U.S. at 439 (plurality opinion) (citation and internal quotation marks omitted). But this

leeway does not diminish the importance of the evidentiary requirement: to establish the constitutionality of Ordinance No. 2010-05, Dix must offer evidence sufficient to "demonstrate a reasonable belief in a causal relationship between [public nudity] and secondary effects." *G.M. Enters.*, 350 F.3d at 640.

Finally, we emphasize that this dispute is only at the motion-to-dismiss stage. In reversing the district court, we conclude only that Dix—at this early phase of the litigation—has not pointed to sufficient secondary effects evidence to permit disposing of plaintiffs' claim altogether. If, on remand, Dix produces concrete evidentiary support, and "[i]f plaintiffs fail to cast direct doubt on [its proffered] rationale, either by demonstrating that [Dix]'s evidence does not support its rationale or by furnishing evidence that disputes [Dix]'s factual findings," Ordinance No. 2010-05 should be upheld. *Alameda Books*, 535 U.S. at 438–39. By contrast, "[i]f plaintiffs succeed in casting doubt on [Dix]'s rationale in either manner, the burden shifts back to [Dix] to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* at 439. To dismiss plaintiffs' claim now, when Dix has not yet made any affirmative showing of adverse secondary effects and plaintiffs have therefore not received a full and fair opportunity to challenge Dix's findings,[7] would be premature.

---

[7] Plaintiffs claim that Dix "adopted [Ordinance No. 2010-05] solely for the purpose of interfering with Plaintiffs' business and suppressing the entertainment offered to willing customers." While the Supreme Court has repeatedly held that it "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive," *O'Brien*, 391 U.S. at 383, plaintiffs are nevertheless entitled an opportunity to dis-

### B. Alcohol Regulations

Plaintiffs also argue that, under Illinois law, Dix lacked authority to pass the open container ban (Ordinance No. 2010-04) and the prohibition on the possession of alcohol in public accommodations (Ordinance No. 2010-06). They further contend that, even if Dix acted within the parameters of Illinois law in enacting the challenged regulations, the bans nevertheless violate the First Amendment because Dix has produced no evidence demonstrating that the possession of liquor by patrons of a business offering erotic entertainment generates adverse secondary effects.

The Illinois Liquor Control Act ("ILCA"), 235 Ill. Comp. Stat. 5, is the primary statute governing the ability of Illinois municipalities to regulate the sale and distribution of alcohol, and "prescribes the limits beyond which a municipality may not act." *Cheetah Enters., Inc. v. Cnty. of Lake*, 317 N.E.2d 129, 132 (Ill. App. Ct. 1974). The ILCA instructs that its provisions "shall be liberally construed, to the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted." 235 Ill. Comp. Stat. 5/1-2.

Plaintiffs contend that the challenged ordinances violate § 2-1 of the ILCA, which states, "nothing herein contained shall prevent the possession and transportation of alcoholic liquor by the possessor for the personal use of the possessor, his family and guests." 235 Ill. Comp. Stat. 5/2-1. But Dix has not prohibited the possession or transportation of alcohol for

---

pute the evidence offered in support of Dix's secondary effects rationale. *Alameda Books*, 535 U.S. at 438–39.

"personal use"; it has simply regulated the possession and consumption of alcohol *in public*.[8]

Dix argues that its authority to enact the challenged alcohol restrictions derives directly from § 4-1 of the ILCA, which permits municipalities to "establish such further regulations and restrictions upon the issuance of and operations under local licenses not inconsistent with law as the public good and convenience may require." 235 Ill. Comp. Stat. 5/4-1. However, § 4-1 applies specifically to the regulation of those establishments that have been granted municipal licenses to sell liquor. As Dix is a dry municipality,[9] neither Foxxxy Ladyz nor any other commercial establishment within the Village has received such a license, and therefore § 4-1 does not control. Yet § 4-1 is nonetheless instructive. Given that our court has interpreted this provision as a grant of

---

[8] It is worth noting that the State of Illinois has enacted a statewide ban on the transportation of open containers of alcohol in vehicles, so § 2-1 of the ILCA cannot fairly be read to guarantee individuals an uninhibited right to possess and transport alcohol, no matter the circumstances. *See* 625 Ill. Comp. Stat. 5/11-502 ("[N]o driver [or passenger] may transport, carry, possess or have any alcoholic liquor within the passenger area of any motor vehicle upon a highway in this State except in the original container and with the seal unbroken.").

[9] Pursuant to 235 Ill. Comp. Stat. 5/9-2, a municipality that currently permits the sale of alcohol may not prohibit it without obtaining authorization via a general referendum. Once a municipality has attained "dry" status, however, the municipality may remain dry until a general referendum is passed requiring it to again permit the sale of alcohol. 235 Ill. Comp. Stat. 5/9-10. According to plaintiffs, § 9-2 implies that Dix could not ban the consumption of alcohol in public without conducting a similar referendum. But § 9-2 applies only to prohibitions on the *sale* of alcohol—not its public consumption. Put simply, the ILCA's referendum requirement is inapplicable to the restrictions at issue here.

"broad discretionary authority" to aid municipalities in their regulation of liquor licensees, *Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 510 (7th Cir. 2013), it makes little sense to conclude that, where a municipality has properly banned liquor licenses altogether, it lacks implicit authority to impose additional restrictions that advance its long-held "dry" status—particularly where such restrictions further the ILCA's public safety goals.

Moreover, while the ILCA is silent as to both public consumption and BYOB, Dix finds authorization for the enactment of Ordinance Nos. 2010-04 and 2010-06 in the Illinois Municipal Code, 65 Ill. Comp. Stat. 5. The Code expressly endorses Ordinance No. 2010-06, Dix's prohibition on the possession of alcohol in public accommodations, by permitting municipalities to "regulate businesses operating as a public accommodation that permit the consumption of alcoholic liquor on the business premises and that are not licensed under the [ILCA]." 65 Ill. Comp. Stat. 5/11-42-10.1. As an "entertainment" facility that permits any individual over age twenty-one to enter and consume alcohol, Foxxxy Ladyz constitutes a "public accommodation" within the meaning of the Code, and Dix therefore acted within its express statutory authority in restricting the possession of alcohol therein. *See id.* ("'[P]ublic accommodation' means a refreshment, entertainment, or recreation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, or advantages are extended, offered, sold, or otherwise made available to the public.").

With regard to Ordinance No. 2010-04—Dix's open container ban—the Municipal Code makes no express reference to open containers of alcohol in public; however, it empow-

ers all Illinois municipalities to "prevent intoxication … and all other disorderly conduct." 65 Ill. Comp. Stat. 5/11-5-3. Countless municipalities in the State of Illinois have elected to prohibit public consumption of alcohol as one method of combating intoxication. *See, e.g.,* Chi., Ill., Mun. Code § 8-4-030 ("It shall be unlawful for any person to drink any alcoholic liquor as defined by law on any public way … ."). Read in conjunction with the permissive language of the ILCA, the Municipal Code confirms the Illinois legislature's intent to confer on municipalities broad discretion to regulate alcohol consumption in order to promote public health and safety, including via the imposition of a prohibition on open containers of alcohol in public. We therefore conclude that Dix's enactment of Ordinance Nos. 2010-04 and 2010-06 falls within the parameters of Illinois law.

Turning to whether the challenged alcohol regulations comport with constitutional requirements, that inquiry is a simple one. We have unequivocally held that the First Amendment does not entitle a bar, its dancers or its patrons, "to have alcohol available during a 'presentation' of nude or semi-nude dancing." *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 726 (7th Cir. 2003). In *Ben's Bar, Inc. v. Village of Somerset*, we upheld a municipal ordinance prohibiting the sale, use, or consumption of alcohol on the premises of "Sexually Oriented Businesses." *Id.* at 704, 728. Concluding that the regulation at issue was "not a restriction on erotic expression, but a prohibition of nonexpressive conduct (i.e., serving and consuming alcohol) during the presentation of expressive conduct," we subjected the challenged regulation to intermediate scrutiny. *Id.* at 724, 726. However, in contrast to the regulation at issue in *Ben's Bar*, the challenged ordinances here do not single out "sexually oriented businesses,"

which are subject to some limited amount of First Amendment protection; rather, Ordinance Nos. 2010-04 and 2010-06 apply broadly to all public accommodations and do not, on their face, target establishments where protected expressive conduct is likely to occur. Therefore, the district court correctly concluded that Dix's alcohol ordinances burden no fundamental rights, and that the ordinances need only withstand rational basis review.

A regulation satisfies rational basis so long as it is rationally related to some legitimate government interest. *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013). Such a regulation "bear[s] a strong presumption of validity" and the challenging party bears the burden of negating "every conceivable basis which might support it." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993). Further, under rational basis review, "it is entirely irrelevant … whether the conceived reason for the challenged [regulation] actually motivated the legislature." *Id.* at 315. "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.*

Based on this deferential standard of review, plaintiffs' challenge fails. Dix's asserted interests in enacting the alcohol restrictions—maintaining "social order, health, welfare, and safety" and "preserv[ing] the 'dry' status of the Village of Dix to the fullest extent permitted by law"—are undoubtedly legitimate and bear a reasonable relation to the open container and public accommodations bans. Although plaintiffs allege that the true motivation behind the alcohol restrictions was to interfere with the successful operation of Foxxxy Ladyz, this allegation is insufficient to render a regu-

lation invalid under rational basis review so long as some hypothetical legitimate government interest exists to support the challenged regulation. *See id.* Finally, because regulations survive rational basis review even if they are "speculation[s] unsupported by evidence," *id.*, Dix was under no obligation to demonstrate concrete evidence of adverse secondary effects prior to enacting the contested ordinances. The district court was therefore correct to dismiss plaintiffs' challenge to Ordinance Nos. 2010-04 and 2010-06.

## III. Conclusion

We REVERSE the district court's dismissal of plaintiffs' challenge to Dix's public nudity ban but AFFIRM its dismissal of plaintiffs' challenge to Dix's alcohol regulations, and REMAND for further proceedings consistent with this opinion.