**BBL, INC., Alva J. Butler, and Sandra K. Butler, Plaintiffs–Appellants,**

v.

**CITY OF ANGOLA, Dean Twitchell, in his official capacity, and Vivian Likes, in her individual capacity, Defendants–Appellees.**

No. 14–1199.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 2014.

Decided Dec. 7, 2015.

Matthew Joseph Hoffer, Attorney, Bradley J. Shafer, Attorney, Shafer & Associates, Lansing, MI, for Plaintiffs–Appellants.

Robert T. Keen, Jr., Attorney, Cathleen M. Shrader, Attorney, Barrett & McNagny LLP, Fort Wayne, IN, Scott D. Bergthold, Attorney, Law Office of Scott D. Bergthold, P.L.L.C., Chattanooga, TN, for Defendants–Appellees.

Before MANION, WILLIAMS, and SYKES, Circuit Judges.

SYKES, Circuit Judge.

Alva and Sandra Butler and their company, BBL, Inc. (we'll refer to them collectively as "BBL"), purchased a restaurant in the City of Angola, Indiana, and planned to convert it to an adult-entertainment venue featuring nude dancing. Within days of the purchase, Angola amended its zoning and other ordinances to make this use of the property impossible. The Butlers and their company brought this suit alleging claims for violation of their rights under the First Amendment and Indiana law. They moved for a preliminary injunction. The district court denied the motion, and the plaintiffs took this interlocutory

appeal seeking review of that decision. *See* 28 U.S.C. § 1292(a)(1) (authorizing interlocutory appeal of orders granting or denying injunctive relief).

The appeal is a procedural and substantive tangle. The judge denied the preliminary-injunction motion in a brief discussion at the end of a 73–page omnibus order addressing multiple motions then pending before the court. Included in the package of motions was a request by the City for judgment on the pleadings on certain parts of the legal test applicable to BBL's First Amendment claim. The judge granted this motion, leaving the final step in the First Amendment analysis for later decision. That approach was unusual; we question whether "judgment" on the pleadings can be granted on intermediate steps in a doctrinal test. This procedural step affected the judge's decision on the preliminary-injunction motion.

Still, the judge was right to deny the motion. At the preliminary-injunction hearing, BBL made a tactical decision not to contest the City's evidence that the challenged ordinances were designed to reduce the negative secondary effects of adult-entertainment establishments. BBL thus stipulated away the key factual issue in the analysis of the First Amendment claim. To the extent that the preliminary-injunction motion was premised on the state-law claims, the judge also correctly denied it.

BBL attacks other aspects of the judge's omnibus order, but our jurisdiction is limited to the denial of preliminary injunctive relief. On that issue, we affirm.

## I. Background

On August 9, 2012, Alva and Sandra Butler submitted the winning bid and a nonrefundable deposit to purchase a restaurant property located at 310 West Wendell Jacob Avenue in the City of Angola.

The purchase also included the restaurant's liquor license and an adjoining lot. The Butlers and their company, BBL, Inc., planned to convert the restaurant to a "liquor-licensed food and beverage serving venue ... that presents to consenting adult patrons clothed female performance dance entertainment." The reference to "clothed" female dancing is misleading; the dancers would wear only "pasties and a g-string," in keeping with Indiana's public-indecency statute. *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (upholding the constitutionality of the statute). This new adult-entertainment venue would be called "Showgirl."

The zoning ordinance then in effect in Angola was promulgated in 2008 and permitted "sexually oriented businesses" to locate in medium-to-large commercial districts. The 2008 ordinance also required businesses in this category to locate at least 1,000 feet away from public gathering places, residential districts, and each other. Finally, the 2008 ordinance required that any new sexually oriented business obtain an Improvement Location Permit. This prerequisite overlaps a provision in Angola's Unified Development Ordinance that requires all property owners to obtain an Improvement Location Permit before making any change in land use.

The parties agree that the property in question is located in a medium-to-large general commercial district. If everything went as the Butlers planned, Showgirl would be the first sexually oriented business in Angola.

On August 16, 2012, the Butlers contacted City Attorney Kim Shoup to confirm that Showgirl would be able to operate at this location under the City's zoning laws. The Common Council quickly instructed Shoup to research the scope of permissible

regulation of sexually oriented businesses. On August 23 Angola's zoning administrator, Vivian Likes, replied by letter to the Butlers' inquiry, stating that this use was not permitted under the 2008 ordinance because a public gathering place was located within 1,000 feet of the property. On September 10 Likes clarified that the public gathering place in question was a proposed Steuben County Multi–Use Trail, on which construction would begin in the spring of 2013.

The Butlers thought Likes was mistaken about the legal effect of the proposed trail because none of the trail heads would be within 1,000 feet of the property and other parts of the trail weren't "public gathering places" within the meaning of the ordinance. So they pressed on with their plan and closed on the property on September 11, 2012.

Angola reacted to this turn of events by changing its zoning and regulatory ordinances for sexually oriented businesses. On September 17 the Common Council adopted Angola Ordinance No. 1418–2012, entitled *An Ordinance Establishing Licensing Requirements and Regulations for Sexually Oriented Businesses within the City of Angola, Indiana.* This ordinance began with several pages of citations to court cases and studies regarding the negative secondary effects of sexually oriented businesses. Next came three specific factual findings:

> (1) Sexually oriented businesses ... are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation.

> (2) Sexually oriented businesses should be separated from sensitive land uses to minimize the impact of their secondary effects upon such uses, and should be separated from other sexually oriented businesses, to minimize the secondary effects associated with such uses and to prevent an unnecessary concentration of sexually oriented businesses in one area.

> (3) Each of the foregoing negative secondary effects constitutes a harm which the City has a substantial government interest in preventing and/or abating. ... [T]he City's interest in regulating sexually oriented businesses extends to preventing future secondary effects of either current or future sexually oriented businesses that may locate in the City. The City finds that the cases and documentation relied on in this ordinance are reasonably believed to be relevant to said secondary effects.

The new licensing ordinance imposed a host of requirements on sexually oriented businesses, but only one is relevant here. Section 19 requires sexually oriented businesses to be located "at least 750 feet from every residence." It's undisputed that BBL's property doesn't meet this requirement.

On November 12 the Angola Plan Commission recommended that the Common Council amend the 2008 zoning ordinance to remove sexually oriented businesses as a permitted use in commercial districts and move them to moderate-intensity industrial districts. In addition, to bring the zoning code into conformity with the new licensing and regulatory ordinance for sexually oriented businesses, the Commission recommended adding an identical requirement of a 750–foot buffer zone from any residence. The preexisting dispersal requirement—requiring sexually oriented businesses to be located at least 1,000 feet from residential districts, public gathering

places, and each other—was retained. Finally, the Commission recommended repealing the specific requirement in the 2008 ordinance that sexually oriented businesses obtain an Improvement Location Permit. The generally applicable provision requiring *all* property owners to obtain an Improvement Location Permit before making *any* change in land use would remain in place.

On November 19 the Common Council adopted the Commission's recommendations as Ordinance No. 1425–2012, *An Ordinance Amending the Unified Development Ordinance with Respect to the Regulation of Sexually Oriented Businesses.* The new zoning ordinance contains a list of justifications substantially similar to those in the new licensing and regulatory ordinance described above.

As this regulatory and rezoning activity was occurring, BBL began some limited construction at the property, including resurfacing the parking lot, reroofing the building, and taking care of miscellaneous maintenance tasks. During this time, Angola's building commissioner, Dean Twitchell, visited the property several times. He told the Butlers that installing new roofing material and demolishing interior non-load-bearing walls wouldn't require a permit. But on October 1 he ordered the Butlers to stop work when he noticed that a load-bearing wall was being dismantled and a new partition wall installed. This type of construction could only take place pursuant to a "construction design release" from the State of Indiana and a building permit from the City. At this point the Butlers halted their construction efforts. By this time they had invested at least $456,000 into the project, including $175,000 for the property, $90,000 for the front parking lot, and $85,000 for the liquor license.

BBL requested and received the required construction design release from the State but never applied for a building permit from Angola. On November 7, 2012, BBL submitted an application to the City for a license to operate a sexually oriented business, as required by the new licensing and regulatory ordinance. BBL also applied for an Improvement Location Permit, a prerequisite for any change in land use in the City. By letter dated November 26, Twitchell denied the license application because BBL proposed to locate Showgirl within 750 feet of parcels containing residences. BBL appealed this decision to a hearing officer and lost. Soon after, Likes responded to BBL's application for an Improvement Location Permit. She said the permit couldn't be issued because the application was incomplete—and in any case it would likely be denied because the property was within 750 feet of parcels containing residences.

In March 2013 BBL sued the City of Angola, Twitchell, and Likes in federal court alleging claims under 42 U.S.C. § 1983 and state law. (We'll refer to the defendants collectively as "the City" unless the context requires otherwise.) The complaint is lengthy—48 pages and 262 numbered paragraphs—and is organized into seven separate counts. Counts I and II allege that the City violated state-law requirements for zoning ordinances. Count III alleges that the City violated Indiana's liquor laws by limiting the operation of a business holding a liquor license. Count IV alleges that requiring a sexually oriented business to obtain an Improvement Location Permit constitutes an unlawful prior restraint on speech in violation of the First Amendment. Count V alleges more generally that the 2012 zoning and licensing amendments—in particular, the new provisions requiring a 750–foot buffer zone from any residence—violate the First Amendment. The final two counts are not really

separate substantive claims: Count VI alleges that Likes is liable in her individual capacity, and Count VII requests an award of attorney's fees under 42 U.S.C. § 1988. The complaint seeks declaratory and injunctive relief and damages.

Before the defendants answered the complaint, BBL filed an even longer amended complaint—168 pages and 1,046 paragraphs—adding reams of factual material in response to the secondary-effects caselaw and data the City cited in promulgating the new ordinances. The City moved to strike the amended complaint. A magistrate judge granted this motion and reinstated the original complaint.

■ The City then moved for partial judgment on the pleadings. *See* FED. R. CIV. P. 12(c). The motion was peculiar in that it was directed at the state-law claims, the prior-restraint claim, and *certain elements* of the doctrinal test applicable to the First Amendment claim. We'll elaborate on this point in a moment, but for now it's enough to say that the applicable legal test derives from the Supreme Court's opinions in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), and generally requires the City to show that (1) the challenged zoning requirements are aimed at reducing the negative secondary effects of adult-entertainment establishments; (2) the requirements are narrowly tailored to serve to that purpose; and (3) the zoning scheme leaves open reasonable alternative sites for this form of expression. The City's Rule 12(c) motion asked for judgment on the pleadings on steps one and two in the *Renton/Alameda Books* analysis. By separate motion filed two weeks later, the City sought summary judgment on step three.

In due course BBL filed the preliminary-injunction motion on which this appeal is based. BBL also asked the court to consider granting summary judgment in its favor as the nonmoving party under Rule 56(f)(1) of the Federal Rules of Civil Procedure. The district court held hearings and eventually issued a single lengthy decision addressing this bevy of motions. The judge granted judgment on the pleadings for the City on the state-law claims, the prior-restraint claim, and the first two elements of the *Renton/Alameda Books* test. The judge denied the City's motion for summary judgment on step three of the *Renton/Alameda Books* analysis—the adequacy of alternative sites for this expressive activity—and declined BBL's request for summary judgment under Rule 56(f)(1). Finally, in a brief two-page discussion, the judge denied BBL's motion for a preliminary injunction. Two issues thus remain open in the district court: the adequacy of the alternative sites for adult-entertainment establishments in the City and attorney's fees (should BBL prevail on the merits).

The City moved for reconsideration, but the judge denied the motion. Pursuant to § 1292(a)(1), BBL filed this interlocutory appeal.

## II. Discussion

Section 1292(a)(1) limits our review to the district court's denial of the motion for a preliminary injunction. The judge's rulings on the other motions—for partial judgment on the pleadings, summary judgment, and to strike the amended complaint—are not before us except to the extent that the judge's analysis of those motions affected his decision to deny preliminary injunctive relief.

■ To obtain a preliminary injunction, the moving party must make an initial showing that (1) it will suffer irreparable

harm in the period before final resolution of its claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008). If the moving party makes this showing, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied. *ACLU of Ill. v. Alvarez,* 679 F.3d 583, 589 (7th Cir.2012).

■ The issues on this appeal relate solely to BBL's likelihood of success on the merits. We review the district court's denial of a preliminary injunction for abuse of discretion, although legal issues are reviewed de novo. *Girl Scouts of Manitou Council,* 549 F.3d at 1086.

## A. First Amendment Claims

The heart of BBL's case is its claim that the City's actions violated its right to expression under the First Amendment. As we've noted, BBL actually makes two First Amendment claims: (1) the 2012 licensing and zoning amendments violate its right to expressive conduct; and (2) the permit requirement is an impermissible prior restraint on speech.

■ The second claim is quite straightforward so we'll resolve it first. The City's requirement that sexually oriented businesses obtain an Improvement Location Permit was removed in the 2012 zoning amendments, so any challenge to that provision is moot, as the district court correctly concluded. *See; e.g., Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago,* 326 F.3d 924, 930 (7th Cir.2003) ("[R]epeal of a contested ordinance moots a plaintiff's injunction request, absent evidence that the City plans to or already has reenacted the challenged law or one substantially similar."). What remains is the City's preexisting zoning rule that *all* property owners seeking to make *any* change of land use must secure an Improvement Location Permit. Because this requirement is generally applicable and doesn't discriminate based on the content of speech, it lacks a "close enough nexus to expression" for us to entertain a facial challenge under the First Amendment. *See City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 759, 761, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[A] law requiring building permits is rarely effective as a means of censorship.").

BBL doesn't have grounds to challenge the permit requirement as applied either. As the district court correctly noted, the City relied on reasons unrelated to speech or expression in denying BBL's application for an Improvement Location Permit: (1) the application was incomplete; and (2) a complete Improvement Location Permit application would likely be denied based on the 750–foot distance requirement from residential parcels. Regarding the latter reason—the substantive one—the City's use of a permit requirement to enforce its zoning laws is not itself problematic. To get anywhere, BBL must have some likelihood of success on its claim that the 2012 licensing and zoning amendments—more specifically, the 750–foot residence buffer-zone requirement—is invalid. We therefore concentrate our attention on BBL's challenge to the validity of the 2012 licensing and zoning amendments.

Before proceeding, however, we pause to note a potential procedural problem in the manner in which the parties and the district court approached this claim. To begin, they split a single claim into multiple components based on the elements of the applicable constitutional test. The judge

then granted the City's motion for judgment on the pleadings on certain elements of that single claim. There's reason to question this approach.

■ "A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir.2014). A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir.2014) (quotation marks omitted) (applying Rule 12(b)(6)).

■ Summary judgment is different. The Federal Rules of Civil Procedure explicitly allow for "[p]artial [s]ummary [j]udgment" and require parties to "identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought." FED. R. CIV. P. 56(a) (emphasis added). At the summary-judgment stage, the court can properly narrow the individual *factual* issues for trial by identifying the material disputes of fact that continue to exist.

As a procedural matter, then, the City's motion for judgment on the pleadings on *parts of* the First Amendment claim may have been improper. The judge's decision to grant the motion affected his assessment of BBL's request for a preliminary injunction, but no one noticed the potential procedural irregularity until we raised it at oral argument. As we'll see, it's not strictly germane to this interlocutory appeal, so we don't need to resolve the question here.

■ Turning now to the merits, nude dancing "is expressive conduct within the outer perimeters of the First Amendment." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion). The basic framework for analyzing this claim derives from the Supreme Court's decisions in *Renton* and *Alameda Books*, which involved challenges to ordinances limiting where a sexually oriented business could operate. *Renton* involved a traditional zoning ordinance; *Alameda Books* involved an ordinance prohibiting multiple adult-oriented businesses in the same building. *Alameda Books* was decided by a plurality plus Justice Kennedy; we've treated Justice Kennedy's concurrence, the narrower opinion, as the holding of the case. *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 465 (7th Cir.2009); *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631, 637 (7th Cir. 2003).

■ Regulations on sexually oriented businesses are nearly always reviewed under intermediate scrutiny as content-neutral regulations. *See, e.g., Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion); *id.* at 447–49, 122 S.Ct. 1728 (Kennedy, J., concurring); *Renton*, 475 U.S. at 41, 106 S.Ct. 925; *Foxxxy Ladyz Adult World, Inc. v. Village of Dix*, 779 F.3d 706, 711–12 (7th Cir.2015); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 723–24 (7th Cir.2003). The "content-neutral" label in this context is a misnomer; regulations aimed at adult businesses apply to certain types of speech and not others. As such, Justice Kennedy remarked in his *Alameda Books* concurrence that "[t]hese ordinances are content based, and we should call them so." *Alameda Books*, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring).

■ Regardless of the label, the first question in a case like this is whether the challenged regulations "are *justified* without reference to the content of the regulated speech." *Renton*, 475 U.S. at 48, 106 S.Ct. 925 (quotation marks omitted). In the ordinary case, regulations on sexually oriented business will meet this standard if they're aimed at "the harmful secondary effects related to that conduct, *i.e.*, the subsidiary effects or 'noncommunicative impact' of the speech." *Schultz v. City of Cumberland*, 228 F.3d 831, 841 (7th Cir. 2000). When the government relies on a secondary-effects justification to regulate this category of expression, we "presume that the government did not intend to censor speech" and therefore apply intermediate scrutiny. *Id.; see also Pap's A.M.*, 529 U.S. at 292, 120 S.Ct. 1382 (plurality opinion) ("Respondent's argument that the ordinance is 'aimed' at suppressing expression through a ban on nude dancing . . . is really an argument that the city council also had an illicit motive in enacting the ordinance. As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive."); *United States v. O'Brien*, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We decline to void [on First Amendment grounds] . . . legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.").

■ Given this doctrine, it's no surprise that regulations on businesses offering sexually oriented entertainment are rarely subject to strict judicial scrutiny. Local governments are usually smart enough to invoke "secondary effects" in their regulation of adult businesses. Reciting the magic words doesn't end the inquiry, of course; whether the adverse secondary effects invoked by the municipality have a basis in reality and are likely to be reduced by the challenged regulation are important inquiries in the intermediate-scrutiny analysis. But when a challenged regulation has been justified with some secondary-effects explanation, the potential or actual invalidity of those explanations doesn't trigger strict scrutiny. As long as "one purpose of the ordinance is to combat harmful secondary effects," the ordinance is regarded as content neutral (despite the legal fiction) and thus intermediate scrutiny applies.[1] *Pap's A.M.*, 529 U.S. at 292, 120 S.Ct. 1382 (plurality opinion).

We've previously observed that there is some confusion in the cases about which intermediate-scrutiny test should be used when. *See Ben's Bar*, 316 F.3d at 724 (describing the confusion about the tests); *G.M. Enters.*, 350 F.3d at 638 (declining to choose a test). One possibility is the test for "time, place, and manner" restrictions that was applied in *Renton* and *Alameda Books*. The other is the test for incidental limitations on expressive conduct announced in *United States v. O'Brien*.

---

**1.** In its recent decision in *Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015), the Supreme Court clarified the concept of "content-based" laws, which are presumptively unconstitutional and get strict scrutiny. The Court held that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category the Court has said occupies the outer fringes of First Amendment protection. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion).

The *Renton/Alameda Books* test requires the government to show that the challenged ordinance (1) "is designed to serve a substantial governmental interest" and is narrowly tailored to serve that interest; and (2) "allows for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50, 106 S.Ct. 925. In *Ben's Bar* we noted that "the Supreme Court does not always spell out the 'narrowly tailored' step as part of its standard for evaluating time, place, and manner restrictions" in this context, but we held that narrow tailoring is a part of the *Renton* test, just as it is for time, place, and manner restrictions more generally. 316 F.3d at 714 n. 16 (quotation marks omitted).

The *O'Brien* test is arranged differently: [A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. 1673.

In *Andy's Restaurant & Lounge, Inc. v. City of Gary*, 466 F.3d 550, 552–53 (7th Cir.2006), we suggested that zoning ordinances are considered time, place, and manner restrictions—and are evaluated under the *Renton/Alameda Books* framework—while public-indecency statutes are properly regarded as laws incidentally affecting expressive conduct—to which *O'Brien* applies. *Compare Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion) (endorsing the *Renton* time, place, and manner test for a zoning ordinance), *and Renton*, 475 U.S. at 50, 106 S.Ct. 925 (applying the test for time, place, and manner restrictions for a zoning ordinance), *with Pap's A.M.*, 529 U.S. at 289, 120 S.Ct. 1382 (plurality opinion) (applying *O'Brien* to a public-indecency statute); *Barnes*, 501 U.S. at 566, 111 S.Ct. 2456 (plurality opinion) (applying *O'Brien* for Indiana's pasties-and-G-string nude-dancing statute); *and Foxxxy Ladyz*, 779 F.3d at 712 (applying *O'Brien* for another public-nudity ban).

In practice, the two tests are very similar, but as we've seen, they're framed a bit differently. Here, the challenged regulations are about "place." BBL contests the City's requirement that sexually oriented businesses locate at least 750 feet from any residential structure. That the buffer-zone requirement appears in a traditional zoning ordinance *and* in a licensing ordinance makes no difference for purposes of BBL's First Amendment claim, though it may be an important distinction for the state-law claims. Because the challenged ordinances restrict *where* sexually oriented businesses may locate, the *Renton/Alameda Books* approach applies.

We explained in *Annex Books* that the *Renton/Alameda Books* framework requires the regulating authority to establish *through evidence* that the challenged regulation serves a substantial governmental interest and is narrowly tailored toward that end. 581 F.3d at 462–64; *see id.* at 463 ("[T]he public benefits of the restrictions must be established by evidence, and not just asserted."). This can be accomplished by evidence tending to show a link between the adverse secondary effects of adult businesses and the challenged regulatory response. *Id.*

Moreover (and this is really a procedural point), once the government makes this preliminary showing, the challenger gets to fight back. The Supreme Court explained in *Alameda Books* that the plaintiff may cast doubt on a municipality's

rationale "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." 535 U.S. at 438–39, 122 S.Ct. 1728 (plurality opinion). If the plaintiff is successful, it's up to the municipality to "supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* at 439, 122 S.Ct. 1728.

■■ If the challenged regulation survives this analysis, the final step in the *Renton/Alameda Books* framework asks whether the ordinance "allows for reasonable alternative avenues of communication." *Renton,* 475 U.S. at 50, 106 S.Ct. 925. This requirement isn't terribly onerous. Time, place, and manner restrictions obviously "limit or foreclose some avenue of communication; the question is whether there are other adequate means of dissemination." *Matney v. County of Kenosha,* 86 F.3d 692, 698 n. 4 (7th Cir.1996). We've held, for example, that a zoning ordinance limiting adult businesses to 4% of the parcels in a small town is constitutionally acceptable. *See Ill. One News, Inc. v. City of Marshall,* 477 F.3d 461 (7th Cir.2007). But percentages are not dispositive; what's required is that the municipality's zoning scheme leave open "a 'reasonable opportunity' to disseminate the speech at issue." *North Ave. Novelties, Inc. v. City of Chicago,* 88 F.3d 441, 445 (7th Cir.1996) (quoting *Renton,* 475 U.S. at 52, 106 S.Ct. 925).

■■ More could be said about the nuances in Justice Kennedy's reading of the *Renton/Alameda Books* framework, but we don't need to take the analysis any further to decide this case. At the preliminary-injunction hearing, BBL stipulated to the City's secondary-effects justification:

> We'll stipulate that in our preliminary injunction motion we are not challenging here the factual predicate for the ordi-nances. We do want to challenge that. That was part of the amended complaint that was struck. We've asked for discovery on that. We haven't been able to take discovery. So we want to challenge that, at some point, but we will stipulate so that [Angola's counsel] is not concerned that we would go up to the Court of Appeals and make the argument that they ... didn't have a requisite basis at least for this point to enact these ordinances. They're relying on that. That's fine. We're not challenging that here.

In short, BBL reserved its right to contest the City's secondary-effects justification later in the litigation but made a tactical decision not to do so at the preliminary-injunction stage. That decision was fatal to its effort to win interim injunctive relief. The City provided an extensive (if boilerplate) catalog of secondary-effects research that it claims justifies the 2012 amendments to its zoning and licensing ordinances. By stipulating to the "factual predicate for the ordinances"—i.e., the secondary-effects justifications—BBL radically reduced its chances of obtaining a preliminary injunction.

What remains is the question whether the ordinances leave open adequate "alternative avenues of communication." *Renton,* 475 U.S. at 47, 106 S.Ct. 925. The judge found a material factual dispute on this question and on that basis denied the City's motion for summary judgment. But the judge also concluded that BBL hadn't shown a likelihood of success on this issue. Each side submitted an expert's report explaining how much land in the City remains available for sexually oriented businesses once the zoning restrictions are applied. The City's expert identified 41 parcels containing 110.02 acres and comprising 5.34% of the commercial and industrial acreage in Angola's zoning jurisdiction. BBL's expert, on the other

hand, said there were *no* parcels available, but the judge noted that it was unclear whether the expert had included land zoned for commercial use, industrial use, or both, or whether he applied the 750–foot residence buffer, the other restrictions in the zoning ordinance, or both. On this uncertain record, the judge declined to issue a preliminary injunction.

We see no error in that conclusion. BBL acknowledges on appeal that the City identified plenty of sites where an adult business can currently locate. Its only argument on appeal is that adult businesses couldn't locate anywhere in the City for the two-month period between September 17, 2012, when the licensing ordinance was adopted, and November 19, 2012, when the zoning ordinance was amended. This temporary state of affairs for two short months in the fall of 2012 is no basis for a court today to issue an injunction. With the adoption of the November 2012 zoning amendments, it became possible to locate adult businesses in Angola, and that's enough to defeat BBL's argument. *See Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir.2006) (explaining that a claim for injunctive relief becomes moot when "the threat of the act sought to be enjoined [has] dissipate[d]").

**B. State–Law Claims**

BBL also based its motion for a preliminary injunction on its two state-law claims. The judge granted judgment on the pleadings for the City on these claims and thus did not consider them in the preliminary-injunction calculus. BBL reprises its merits arguments on these claims, but our jurisdiction doesn't include review of the judge's order granting judgment on the pleadings. We'll address these issues only to the extent that they bear on the preliminary-injunction question.

Indiana law requires municipalities to amend their zoning ordinances through a process involving the city's plan commission and board of zoning appeals. *See City of Carmel v. Martin Marietta Materials, Inc.*, 883 N.E.2d 781, 784–85 (Ind. 2008) (describing the statutory framework for zoning enactments pursuant to the "600 Series Procedures" of Indiana Code §§ 36–7–4–601 to 616). This procedure "must be followed in order for those ordinances to be valid." *Id.* at 784. BBL argues that the licensing ordinance's 750–foot residential separation requirement was in reality a zoning provision, and because the legal process required for amending zoning ordinances wasn't followed, the ordinance is invalid.

The City maintains that the licensing ordinance doesn't qualify as a zoning ordinance under Indiana law. The judge agreed. We don't see how the classification matters for purposes of BBL's request for a preliminary injunction. The same 750–foot buffer zone was included in the November 2012 amendments to the zoning ordinance, and BBL doesn't challenge the City's process for adopting these amendments. So a preliminary injunction against the same provision in the licensing ordinance would be pointless.

Finally, BBL argues that it had vested nonconforming use rights, which arose at the time it submitted its winning bid on the property on August 9, 2012. Typically, nonconforming-use exceptions to zoning ordinances require actual nonconforming *use* of the property before the newly adopted regulations became effective. *Metro. Dev. Comm'n of Marion Cnty. v. Pinnacle Media, LLC*, 836 N.E.2d 422, 425 (Ind.2005) ("A nonconforming use is a use of property that lawfully existed prior to the enactment of a zoning ordinance that continues after the ordinance's effective date even though it does not com-

ply with the ordinance's restrictions."). Changes in use zoning while a property is in use can raise constitutional concerns, so municipalities usually have a system for protecting, at least to a limited extent, the property owner's continued use of the property under the old zoning rules. *See id.* ("[T]he government could not terminate [the use once it's established] without implicating the Due Process or Takings Clauses of the Fifth Amendment of the federal constitution. . . .").

At least two things are different here from the typical vested-rights scenario. First, there hasn't been any actual *use* of the property as a sexually oriented business. At most, BBL purchased the property, performed limited construction, and applied for a few government authorizations. This isn't necessarily an insurmountable obstacle, at least in principle:

> [W]here a property owner has manifested an intent to use the property for a certain use and has made substantial investments and preparatory steps in good faith reliance on then existing zoning regulations, the courts may relax the requirement of an actual preexisting use and find a "vested right to a nonconforming use."

2 PATRICIA E. SALKIN, AMERICAN LAW OF ZONING § 12:16 (5th ed. 2015); *see also Pinnacle Media,* 836 N.E.2d at 428–29 ("[The operative] question [is] . . . whether, at the time of the change in the zoning ordinance, construction had proceeded on the project to the point that the developer had a vested interest."); *City of New Haven v. Flying J., Inc.,* 912 N.E.2d 420, 426 (Ind.Ct.App.2009) (calling for "fact-sensitive analysis to determine whether vested rights have accrued prior to application for a building permit or construction" but stating that "construction definitely does establish a vested right").

The second difference between this case and the usual vested-rights case is dispositive, however. Here, the judge held that under Indiana law BBL couldn't advance a vested-rights claim based on *unlawful* construction activity on the property. *Cf. Wesner v. Metro. Dev. Comm'n of Marion Cnty.,* 609 N.E.2d 1135, 1138 (Ind.Ct.App. 1993) (describing the nonconforming use doctrine as requiring "a lawful preexisting nonconforming use"). The judge concluded, based on the evidence presented at the preliminary-injunction hearing, that BBL's construction at the site was conducted unlawfully in violation of the City's building-permit requirement. That strikes us as a reasonable application of Indiana law, at least for purposes of denying preliminary injunctive relief.

BBL makes other arguments on appeal but none are within the scope of our jurisdiction. For the foregoing reasons, the motion for a preliminary injunction was properly denied.

AFFIRMED.