In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3023

HH-INDIANAPOLIS, LLC,

*Plaintiff-Appellant,*

*v.*

CONSOLIDATED CITY OF INDIANAPOLIS
AND COUNTY OF MARION, INDIANA,
*et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-00036-SEB-DML — **Sarah Evans Barker**, *Judge.*

ARGUED MARCH 29, 2018 — DECIDED MAY 7, 2018

Before BAUER, FLAUM, and MANION, *Circuit Judges*.

BAUER, *Circuit Judge.* HH-Indianapolis, LLC ("HH"),
intended to open a retail establishment in Indianapolis under
the name "Hustler Hollywood." After entering into a ten-year
lease at 5505 E. 82nd St. ("the Property"), HH applied for sign
and building permits. Problematically, HH's proposed store

was located in a zoning district that prohibited "adult enter-
tainment businesses," as defined under the Indianapolis-
Marion County Zoning Ordinance ("the Ordinance"). Upon
review, the Department of Business and Neighborhood
Services (DBNS) determined that HH was an adult entertain-
ment business, a decision which the Board of Zoning Appeals
(BZA) affirmed.

HH filed this lawsuit against the Consolidated City of
Indianapolis and County of Marion, Indiana, the DBNS, and
the BZA (collectively, "the City") seeking a declaratory
judgment that the Ordinance violated its First and Fourteenth
Amendment rights and violated state administrative law, as
well as asking for an injunction against the City's enforcement
of the Ordinance against HH. HH challenged the Ordinance
under the First Amendment both as applied to it, as well
as facially for overbreadth and vagueness. The district court
denied HH's motion for a preliminary injunction, and HH filed
this interlocutory appeal challenging that decision only with
respect to its as-applied First Amendment claim. We affirm.

## I. BACKGROUND

HH-Entertainment, Inc., the parent company of HH,
operates retail stores under the name "Hustler Hollywood"
throughout the United States in over twenty locations. HH
was incorporated in Indianapolis in order to open a store that
would sell a variety of merchandise, including lingerie, gag-
gifts, instructional DVDs and literature, marital aids, and
sexual devices, such as dildos and vibrators. According to HH,
when it seeks to open a new retail store, it studies the city's
municipal ordinance in order to avoid being classified as an
"adult" store.

The Ordinance, which went into effect on April 1, 2016, establishes six different Commercial Zoning Districts. City of Indianapolis and Marion County Consolidated Zoning and Subdivision Ordinance, § 742-104(B)–(G) (April 1, 2016). "The C-3 District (Neighborhood Commercial District) is for the development of an extensive range of retail sales and personal, professional and business services required to meet the demands of a fully developed residential neighborhood, regardless of its size." § 742-104(C).

The Ordinance also regulates "adult entertainment businesses." *See* § 743-305(A). An adult entertainment business is prohibited from operating in a C-3 district as a right, although it may obtain a variance to operate in a C-3 district. *See* § 743-305(A)(3)(b). However, an adult entertainment business may operate as a right in three of the six districts: C-4 (Community-Regional District); C-5 (General Commercial District); and C-7 (High-Intensity Commercial District). *Id.*

The various types of adult entertainment businesses are defined under the Ordinance. *See* § 740-202(A). Relevant to this appeal, an "adult bookstore" is defined as follows:

> An establishment having at least 25% of its:
>
> 1. Retail floor space used for the display of adult products; or
>
> 2. Stock in trade consisting of adult products; or
>
> 3. Weekly revenue derived from adult products.

*Id.* "Adult products" means any media (*e.g.*, books, films, magazines, photographs) "that are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas;" as well as any device "designed or marketed as useful primarily for the stimulation of human genital organs, or for sadomasochistic use or abuse," including, but not limited to, chains, dildos, muzzles, phallic shaped vibrators, and whips. *Id.* Additionally, the Ordinance defines an "adult service establishment" as "[a]ny building, premises, structure or other facility, or part thereof, under common ownership or control which provides a preponderance of services involving specified sexual activities[1] or display of specified anatomical areas.[2]" *Id.*

---

[1]   "Specified sexual activities" is defined as any of the following: (1) Human genitals in a state of sexual stimulation or arousal; (2) Acts of human masturbation, sexual intercourse or sodomy; (3) Fondling or other erotic touching of human genitals, pubic regions, buttocks or female breasts; (4) Flagellation or torture in the context of a sexual relationship; (5) Masochism, erotic or sexually oriented torture, beating or the infliction of pain; (6) Erotic touching, fondling or other such contact with an animal by a human being; or (7) Human excretion, urination, menstruation, vaginal or anal irrigation as part of or in connection with any of the activities set forth in" (1) through (6).
   § 740-202(A).

[2]   "Specified anatomical areas" is defined as any of the following: "(1) Less than completely and opaquely covered human genitals, pubic region, buttocks, anus or female breasts below a point immediately above the top of the areolae; (2) Human male genitals in a discernibly turgid state, even

(continued...)

In early 2016, HH began exploring the possibility of opening a store in Indianapolis. HH identified a vacant commercial property at 5505 E. 82nd Street, on Indianapolis' northeast side. The Property is located in a C-3 district,[3] and a driveway separates the Property from a Chuck E. Cheese's, a kid-friendly restaurant and entertainment center. Notably, directly across 82nd Street to the north of the Property is a C-4 district where HH could operate freely as an adult entertainment business as a right.

HH was aware that the City was revising the then-existing zoning ordinance, and preemptively contacted City officials in order to apprise themselves of the revised Ordinance, particularly the "adult" provisions. According to HH, it entered into a ten-year lease at the Property on July 14, 2016, in reliance on the communications it had with City officials. Shortly thereafter, HH applied for a structural permit to remodel the Property, and for a sign permit to hang exterior signs. The DBNS flagged the applications after noticing that the proposed signs stated "Hustler Hollywood," and advertised such things as

---

[2] (...continued)
if completely and opaquely covered." § 740-202(A).

The entire phrase "services involving specified sexual activity or display of specified anatomical areas" is defined as "[a]ny combination or [two] or more" among five different activities. § 740-202(A). The relevant two categories for the purpose of this appeal are discussed below.

[3] Additionally, the Property is 355 feet from a D-2 dwelling district. Under the Ordinance, adult entertainment businesses may not operate as a right within 500 feet of a dwelling district. Thus, even if the Property were not located in a C-3 district, it would still need a variance to operate within that range of a dwelling district.

"erotica." Given that the Property is located in a C-3 district, the DBNS was concerned HH was intending to operate an adult entertainment business. HH's applications were put on hold, and the DBNS requested additional information in order to verify that HH was permitted to operate in a C-3 district. In response, HH submitted a weekly inventory and sales projection, which projected the stock and sales of adult products, a floor plan with square footage designations, and a description of the business. After reviewing this information, which the DBNS described as "imprecise and contradictory," the DBNS concluded that HH was either an adult bookstore or an adult service establishment.

Instead of electing to seek a variance with the DBNS, HH appealed to the BZA. Prior to the hearing before the BZA, the DBNS staff submitted a report explaining its decision. In explaining the adult bookstore classification, the DBNS noted the inventory and sales projection provided by HH indicated that only 16.1% of their inventory and 23.9% of their sales would derive from "adult products." However, the DBNS pointed to other projections that rendered those figures imprecise: 32.2% of inventory and 12.8% of sales were broadly categorized as "general merchandise;" and "toys" accounted for 13.1% of inventory and 28.8% of sales. Adding either of these figures to the adult products figures would put HH above the 25% threshold for adult bookstores under the Ordinance. Moreover, "sensual care" products were to be sold behind a separation wall along with adult products; yet, sensual care products were not included in the adult products projection. HH stated in their business description that sensual care products included gels, oils, lotions and marital aids, and

the DBNS noted that "[m]arital aids, by definition, are sex toys."

Further, the DBNS found that even if HH was not an adult bookstore, it would be classified as an adult service establishment. Under the Ordinance, providing "a preponderance of services involving specified sexual activities or display of specified anatomical areas" means any combination of two or more specified categories of services. According to the DBNS, the two categories that applied to HH were (1) "[t]he sale or display" of media "characterized by an emphasis upon the depiction or description of specified sexual activities or specified anatomical areas;" and (2) the presentation of such media for observation by patrons. The DBNS concluded that HH plainly fit under the first category based on the products it intended to sell, as well as the presentation-of-media category since other Hustler Hollywood locations offered workshops and classes involving live demonstrations or videos, with titles such as "Masturbation Workshop."

The BZA held a hearing on December 6, 2016. HH appeared by counsel and presented a revised inventory and sales projection. HH claimed that the initial projections had mistakenly included figures from nationwide-stores and online sales. In the new projections, only 8.7% of inventory and 12.4% of sales would be "adult products." HH insisted that it did not intend to operate an adult bookstore or an adult service establishment, and that it would not offer any workshops or classes that are offered at other Hustler Hollywood stores. Finally, HH invited City officials to inspect the Property once it was ready to open.

Remonstrators, a group composed of community members, property owners, and tenants, appeared by counsel in opposition to HH's proposed store. They submitted evidence to counter HH's argument that it did not intend to operate an adult entertainment business, including photographs from other Hustler Hollywood locations showing adult products visibly displayed throughout the store, as well as advertisements from the Hustler Hollywood website for workshops and classes at their stores. The Remonstrators also emphasized that the Property was situated next to Chuck E. Cheese's, as well as a bus stop frequented by school children. A City councillor also appeared at the hearing and argued that HH-Entertainment had a history of deception in opening stores nationwide. At the conclusion of the hearing, the BZA voted unanimously, 5-0, to affirm the decision of the DBNS.

Rather than seek judicial review of that decision in an Indiana state court pursuant to Ind. Code § 36-7-4-1614(d), HH filed this lawsuit against the City on January 5, 2017. HH sought declaratory and injunctive relief under three different First Amendment theories: (1) an as-applied challenge to the City's determination that HH is an adult entertainment business; (2) a facial challenge for vagueness to the definition of an "adult service establishment;" and (3) a facial challenge for overbreadth to the definition of an "adult service establishment." HH also sought relief under the Equal Protection Clause of the Fourteenth Amendment, and challenged the City's determination as arbitrary, capricious, and unsupported by substantial evidence under Indiana law.

On June 6, 2017, HH filed for a preliminary injunction. After briefing and a hearing, the court denied HH's motion on

September 22, 2017. *HH-Indianapolis LLC v. Consol. City of Indianapolis/Marion Cty., Ind.*, 265 F. Supp. 3d 873 (S.D. Ind. 2017). The court found that HH was unlikely to succeed on the merits under any of the First Amendment theories, or under the Equal Protection claim. *Id.* at 881–891. Additionally, the court concluded that HH had not alleged an irreparable injury in its state law claim. *Id.* at 891. HH then filed this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).

## II. DISCUSSION

"A preliminary injunction is an extraordinary remedy." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). A party seeking a preliminary injunction must satisfy all three requirements in the "threshold phase" by showing that (1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If a party makes the necessary showing, the court moves to the "balancing phase." *Id.* At that phase, the court employs a sliding-scale approach and "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015).

HH contends that the district court erred with respect to its finding that HH was not likely to succeed on the merits of its as-applied First Amendment claim. The likelihood of success requirement is a low threshold; HH must only show that its

claim's chance of success is "better than negligible." *Whitaker*, 858 F.3d at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). We review the denial of a preliminary injunction for an abuse of discretion, reviewing the legal conclusions *de novo* and the factual findings for clear error. *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018).

At oral argument, HH described its claim as a "content-based, prior restraint, as-applied claim." Combining these various terms from First Amendment jurisprudence into a single claim requires some unpacking. We begin with the framework for analyzing zoning regulations of sexually oriented adult businesses under the First Amendment, which derives from the Supreme Court's decisions in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976) (plurality), *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (plurality). Under this framework, regulations that do not prohibit adult businesses altogether, but merely regulate their location, are analyzed as time, place, and manner regulations. *Renton*, 475 U.S. at 46. The regulations must be "content-neutral,"[4] meaning they are not aimed at the content of the adult businesses, but rather the harmful and undesirable "secondary effects" of such businesses on the surrounding community.

---

[4]    "The 'content-neutral' label in this context is a misnomer; regulations aimed at adult businesses apply to certain types of speech and not others. As such, Justice Kennedy remarked in his *Alameda Books* concurrence that '[t]hese ordinances are content based, and we should call them so.'" *BBL*, 809 F.3d at 325 (quoting *Alameda Books*, 535 U.S. at 448 (Kennedy, J., concurring)).

*Alameda Books*, 535 U.S. at 444–47 (Kennedy, J., concurring);[5] *Renton*, 475 U.S. at 47; *Am. Mini Theaters*, 427 U.S. at 70–72.

If the regulations are "content-based," they "would be considered presumptively invalid and subject to strict scrutiny." *Alameda Books*, 535 U.S. at 434 (plurality opinion). However, "content-neutral" time, place, and manner regulations of adult businesses are subject to intermediate scrutiny which means that: (1) the regulations must be "designed to serve a substantial governmental interest" in curbing the secondary effects, and be narrowly tailored toward that interest; and (2) they must "allow[] for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50–52; *see also BBL*, 809 F.3d at 327.

HH argues that the City's enforcement of the Ordinance, as applied to them, has "silenced" their ability to exercise their First Amendment rights at the location of their choosing. According to HH, the City classified them as an adult entertainment business in order to "suppress" unwanted speech, in light of the public outcry from the Remonstrators.

However, HH's speech has not been silenced or suppressed; rather, HH has only been told that it cannot operate in a particular commercial district and must move elsewhere. "A zoning measure can be consistent with the First Amendment if it is likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech." *Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring).

---

[5]   *Alameda Books* was decided by a plurality, and we have treated Justice Kennedy's concurring opinion as the holding of the case. *See BBL,* 809 F.3d at 325.

Unquestionably, the City has provided HH with reasonable alternative avenues of communication in a number of other commercial districts, a fact HH does not dispute. HH may operate as a right in a C-4, C-5, or C-7 district, and a C-4 district lies directly north of the Property. "[T]he First Amendment requires only that [the City] refrain from effectively denying [HH] a reasonable opportunity to open and operate" an adult entertainment business within Indianapolis. *Renton*, 475 U.S. at 54. There is simply "no First Amendment objection" when the City exercises its zoning power to reduce the secondary effects of adult businesses, and HH has alternative avenues of communication. *Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring).

Moreover, HH does not dispute that the Ordinance is "content-neutral," or that the City's interest in reducing the secondary effects of adult businesses, codified at length in the Ordinance, is a sufficient or substantial interest. *See* City of Indianapolis and Marion County Consolidated Zoning and Subdivision Ordinance § 743-305(A)(1) ("It is the purpose of this section … to regulate adult entertainment businesses … to promote the health, safety, morals, and general welfare of the citizens of Marion County, and to establish reasonable and uniform provisions to prevent the deleterious effects of adult entertainment businesses within Marion County.") Nor could it since the Supreme Court has repeatedly recognized that this is a legitimate interest. *See Alameda Books*, 535 U.S. at 444 (Kennedy, J., concurring) ("Municipal governments know that high concentrations of adult businesses can damage the value and integrity of a neighborhood … . The law does not require a city to ignore these consequences if it uses its zoning power in a reasonable way to ameliorate them without suppressing

speech."); *American Mini Theaters*, 427 U.S. at 71 ("[T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect."). Accordingly, because the Ordinance is content-neutral, serves a substantial interest, and allows for HH to operate in numerous other commercial districts, HH's likelihood of success on its First Amendment claim is not better than negligible.

HH insists it demonstrated a likelihood of success on the merits because the district court did not employ the proper level of scrutiny in reviewing its claim. According to HH, federal courts dealing with an as-applied challenge have a "duty to engage in a critical examination of the government's reasoning and evidentiary support for applying the ordinance in a particular way." That sounds like strict scrutiny. HH directs us to a number of cases where courts have performed some heightened level of scrutiny in analyzing an as-applied First Amendment challenge. *See, e.g., In re Primus*, 436 U.S. 412, 432–39 (1978) (applying "exacting scrutiny" to South Carolina's attorney regulatory scheme as applied to an attorney soliciting a prospective client by mail); *United States v. Marcavage*, 609 F.3d 264, 274–91 (3d Cir. 2010) (applying strict scrutiny to a content-based application of national park regulation against an anti-abortion protester in a public forum). Yet, none of these cases involve as-applied challenges to constitutional time, place, and manner zoning regulations of adult businesses which the Supreme Court has made abundantly clear are subject to intermediate scrutiny.[6]

---

[6] HH also relies on *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115 (1st Cir. 1981), to support a heightened level of scrutiny. That case involved

(continued...)

The critical inquiry in this as-applied challenge is whether the City's application of the Ordinance to HH resulted in an unconstitutional effect, *i.e.*, an abridgment of its First Amendment rights. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805–12 (1984) (finding no unconstitutional effect in the application of a time, place, and manner ordinance which restricted a political group's ability to post signs on utility poles). The City's application of the Ordinance has resulted only in an incidental restriction on HH's speech in a particular location. HH has not been deprived of their First Amendment right to operate in Indianapolis. The City has simply told HH that it cannot operate in a C-3 district, while also providing numerous other avenues for speech in C-4, C-5, and C-7 districts, including a C-4 district directly across the street.

The City acknowledges that the Ordinance functions as a form of prior restraint, and in fact, did so in this case. Yet, "prior restraints are not per se unconstitutional," *Schultz v. City of Cumberland*, 228 F.3d 831, 851 (7th Cir. 2000), and we have previously stated that prior restraints "are constitutionally legitimate if they are proper time, place, or manner restrictions." *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 1000 (7th Cir. 2002). As we have already found, the Ordinance is a constitutional time, place, and manner regulation. Moreover,

---

[6] (...continued)

an as-applied challenge to a municipal licensing ordinance that regulated adult businesses. *See id.* at 1118–20. However, it lacks persuasive value because it was decided before the Supreme Court's decision in *Renton*, which established the intermediate scrutiny framework for adult zoning ordinances.

HH does not allege a lack of procedural safeguards in the City's zoning scheme that the Supreme Court has noted may result in unconstitutional prior restraint. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–28 (1990) (noting that censorship may result when there is unfettered discretion in the hands of public officials, or a lack of prompt judicial review).

Ultimately, HH's "content-based, prior restraint, as-applied claim" boils down to the following: (1) the evidence does not support the DBNS and BZA's determination that HH was either an adult bookstore or an adult service establishment; (2) the City intended to restrain HH's speech given the public outcry from the Remonstrators; and (3) the City should have at least inspected the Property or allowed HH to open there conditionally. However, an erroneous application of a zoning ordinance is unlikely to be a First Amendment violation. Indeed, federal courts "are not zoning boards of appeal," *CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 487 (7th Cir. 2014), and Indiana law provides judicial review for zoning decisions that are challenged as arbitrary, capricious, or unsupported by the evidence. *See* Ind. Code § 36-7-4-1614(d). In fact, the Supreme Court has found ordinary state court civil procedures sufficient to protect any First Amendment interests in erroneous zoning determinations. *See City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 782 (2004).

Nothing that HH has alleged gives rise to an unconstitutional effect or First Amendment violation. The BZA holds hearings in order to listen to testimony and evidence, including evidence from the DBNS and "other persons," such as the Remonstrators. *See* Ind. Code § 36-7-4-920(e)–(f); Metro Board

of Zoning Appeals of Marion County, Indiana, Rules of Procedure (2014). The BZA did not have to believe HH when it stated it would not offer workshops or classes, nor did it have to ignore evidence from other Hustler Hollywood stores. Additionally, the BZA was not required to disregard HH's initial inventory and sales projections which contradicted their second projections. HH presented no evidence in the district court or on appeal that officials from the DBNS or BZA displayed any bias or censorial intent in their determinations. Furthermore, the City was under no constitutional obligation to inspect the Property or allow HH to open conditionally before making its determination.

Ultimately, the question of whether the City's determination rested on a sufficient evidentiary basis is properly suited for state court review. That evidentiary issue does not present a First Amendment violation, nor does it justify the issuance of a preliminary injunction.

## III.  CONCLUSION

Since HH has failed to establish that its as-applied First Amendment claim has a better than negligible chance of success on the merits, it is not entitled to a preliminary injunction. Accordingly, the district court's denial of the issuance of a preliminary injunction is AFFIRMED.